## KANSAS CITY STRUCTURAL STEEL CO. v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Eighth Circuit.
May 14, 1929.

No. 8358.

Armwell L. Cooper, of Kansas City, Mo. (Ellison A. Neel, Whitson Rogers and John P. Cooper, all of Kansas City, Mo., on the brief), for appellant.

Randolph C. Shaw, Sp. Asst. Atty. Gen. (Mabel Walker Willebrandt, Asst. Atty. Gen., Sewall Key, Sp. Asst. Atty. Gen., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Clark T. Brown, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., on the brief), for appellee.

Before LEWIS, Circuit Judge, and WOODROUGH and McDERMOTT, District Judges.

McDERMOTT, District Judge. This appeal brings on for review a decision by the Board of Tax Appeals, sustaining a deficiency assessment against the appellant in the sum of $7,656.74. The case was presented to the Board upon a stipulation of facts. The Board made findings of fact, which are substantially as stipulated. There is no record of any evidence being offered in addition to the stipulation, except that the opinion states "the evidence establishes clearly that same undeterminable part of the steel on hand in 1916 remained during the taxable years."

Whether there was other evidence of this fact is not material, for it is a natural inference deducible from the facts stipulated and found.

The question presented is whether, in arriving at the taxable income of the appellant, the Commissioner had a right to consider the inventory value of a stock of steel, set apart

by the appellant as an "emergency" or "reserve" or "stand-by" stock.

It is stipulated that:

"The Company is engaged in the fabrication and erection of structural steel plates for buildings, bridges, tanks, etc. It fabricates material for specific structures or contracts and carries no finished product in stock. Material is ordered and procured from the mills for each specific structure or contract, except that a supply of material as shown in Exhibit A has been kept on hand for emergency use (from which material is borrowed and replaced) to insure the prompt and orderly execution of contracts in view of delay, etc., incident to shipments from the mills and other exigencies affecting the availability for use when needed of material ordered for a particular job. When such material is used it is charged to the contract at its replacement cost and is promptly replaced with material of a like kind and in a like quantity."

Upon argument, it was stated, and not denied, that the business of the taxpayer consisted, in large part at least, of bidding for the steelwork of buildings and bridges and other structures where steel is used; these bids are predicated upon firm offers procured from the mills for the steel involved, plus the cost of fabrication and a profit. If the bid was accepted, the materials were ordered for the job. This seems to be the only inference that can be drawn from the facts stipulated, to wit, "It fabricates material for specific structures or contracts and carries no finished product in stock," and "material is ordered and procured from the mills for each specific structure or contract." The taxpayer's business is closely akin to that of a building contractor, which, as far as steel is concerned, it is.

It is further stipulated that this emergency reserve consisted of 5,554 tons of structural steel, being the amount on hand on December 31, 1916. Its cost was $1.70 per cwt. f. o. b. Pittsburgh. It is stipulated that this price of $1.70 "represented the highest normal market encountered since 1895." From that date on until December 31, 1921, this steel was treated as above stipulated. All materials of like dimensions were piled piece upon piece in perpendicular piles. This stock varied in size during the year, being both below and above the 5,554 tons, as material was used therefrom and replaced therein; the extreme limits from 1916 on, for any part of the year, being approximately 4,000 and 11,000 tons. Except for the years 1917 and 1921, the reserve exceeded 5,554 tons on December 31 of each year. These years are not

in controversy, and the shortage was inconsiderable. Whenever the reserve exceeded 5,554 tons on December 31, the excess was valued at current prices, and a tax paid thereon.

In figuring up its taxable profit for the years 1918 to 1920, inclusive, the appellant treated this emergency steel as a part of its fixed equipment, and carried it at the 1916 cost price of $1.70 per cwt. The stipulation states:

"The Company, at the end of the years 1916, 1917, 1918, 1919 and 1920, valued its said supply of 5554 tons at the cost price prevailing at the close of 1916, or $1.70 per hundred weight f. o. b. Pittsburgh."

Since the reserve did not consist of the identical pieces in the pile on December 31, 1916, and which cost $1.70 per cwt., and since it was impossible to ascertain the cost of the steel actually in the pile, the Commissioner inventoried the entire stock at the market price of the steel most recently purchased, under the rule prescribed by article 1582, Regulation 45, that the presumption is "the first in, the first out." Whether this presumption is a fair one in the face of the actual probability that workmen would take a girder off the top of a pile instead of the bottom, is challenged by the appellant, but need not be considered.

The result of the two methods of pricing the inventory was that the government figured the income of the appellant to be $18,230.10 more than the appellant figured it. A deficiency assessment of $7,656.74 was made; an appeal to the Board of Tax Appeals was unsuccessful; and the case is here on review.

Since the taxpayer figured this emergency steel as a part of its fixed equipment, no claim was filed for abatement under sections 214(a)(12), and 234(a)(14) of the Revenue Act of 1918 (40 Stat. 1066, 1079), for inventory losses occurring when prices began to fall. On December 31, 1921, "after prices became normal," and when the price of the steel had dropped below the 1916 level ($1.50), the taxpayer acquiesced in the government position, and the emergency reserve was priced by the taxpayer at its cost, or market, whichever was lower. It will thus be seen that the taxpayer had 5,554 tons of $1.70 steel on hand on December 31, 1916; and 5,554 tons of $1.50 steel of a like kind and in a like quantity on hand on December 31, 1921; and that no income had been enjoyed by the taxpayer through its maintenance of this reserve during the five years.

While no claim for abatement was made under the cited sections of the 1918 law, as recited in the stipulation, it does appear that

before the Board of Tax Appeals the taxpayer asked credit for a loss in the inventory, due to the falling market in the year 1919. This claim is inconsistent with its present contention, and the record is not clear as to whether the taxpayer asserted this claim as a counter attack, after the government had asserted the right to tax the paper profits on the same steel during the advancing prices. The Board of Tax Appeals upheld the government's right to tax the profit on the advancing market, but denied the taxpayer the credit for losses on the falling market because they were not actual losses. The taxpayer has not appealed from that part of the order, but insists that, if the Board denies a credit for losses because they are not actual, it ought not to tax income unless it is realized.

The good faith of the taxpayer is not questioned. The stipulation sets out facts indicative of good faith. The reserve was set apart when prices were at the highest level since 1895; during the succeeding years its market value doubled, and yet the taxpayer did not liquidate it and take its profit; it kept it until prices were below the 1916 level, and it showed a loss; although the amount actually on hand, at the close of the year, was sometimes much more than 5,554 tons, it accounted for the excess to the government. It must be assumed that the reserve was in fact maintained for the purpose as stipulated, and that it was reasonable in amount.

It will be seen at once that the underlying question is the propriety of including this reserve supply in an inventory taken as an aid to the ascertainment of income. Before dealing with that, it may be as well to consider one or two arguments made by the government in support of its position. It is urged that in 1921, when prices had gone down, the appellant itself included the entire emergency reserve at 1921 prices, and that the taxpayer applies one rule when prices are high and another when prices are low. The government makes the very sound argument that one of the prime requisites of any tax system is consistency; that, when a taxpayer has adopted one system, it should be adhered to, in fair weather or in foul; and that no taxpayer should be permitted to play fast and loose with his government. This very fair and sound rule does not apply, however, where the taxpayer changes his position at the government's requirement; if the appellant is right in its contention, it cannot be denied relief because it, although still protesting, acquiesced in the ruling, either because the drop in price had eliminated any substance to the disagreement or because it became weary of the contest. It is also urged that the appellant, during these very years, included as a part of its income the increase in value of the excess of the emergency steel over 5,554 tons, and thereby attested the correctness of the government's position. The conclusion does not follow. As to the excess, the appellant doubtless recognized that an emergency supply must bear a fair proportion to the requirements of the business; having determined that 5,554 tons was an adequate reserve for a business that fabricated about 30,000 tons a year, it should account for any excess above that amount. Moreover, that the taxpayer may have paid more taxes than it should have is not adequate reason for a disposition of this case. The government urges that this is but another claim of the right to set up a "minimum inventory" formerly but unsuccessfully claimed by retailers and dealers. If it is, then the appeal must fail; but that is to assume the correctness of the real controversy, to which we now turn.

Inventories reflect what a man has, and not what he earns; they reflect capital, and not income; many times, in practice, they distort income. Many a merchant has paid an income tax predicated upon the cost or market of goods on his shelves, only to find that, by the time the goods were sold, he had sustained a loss instead of a profit. The bankruptcy courts of the deflation period were flooded with claims of unpaid income taxes of the preceding years, a taxation on an income never in fact realized—a paper profit in an inventory which was turned into a loss in a few short months.

The use of inventories to reflect income is resorted to from necessity. There are a great many business institutions that must either take into account their inventories or not compute their income at all. It is a financial if not a practical impossibility to ascertain the cost and selling price of each spool of thread sold by a retailer, or each sack of flour made by a miller. If it could physically be done, the cost of the bookkeeping might be more than the gross receipts. Hence not only the propriety, but the necessity, of the use of inventories in certain lines of business.

The statute recognizes this, and the statutory power to use inventories is predicated upon necessity. Section 203 of the Revenue Act of 1918 (40 Stat. 1060) provides:

"That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any tax-payer, inventories shall be taken by such tax-payer upon such basis as the

Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

The regulation enacted in pursuance thereto provides (article 1581, Reg. 45):

"In order to reflect the net income correctly, inventories at the beginning and ending of each year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor."

Foulke on the Federal Income Tax (§ 642) says:

"Inventories are necessary in business affairs according to the exigencies of each particular case. The statute provides that inventories shall be used in income tax accounting whenever necessary in the opinion of the Commissioner to clearly determine income. The Commissioner thus has discretion to determine whether or not in fact inventories are necessary and which discretion is no doubt subject to review by the court, although no case appears to have yet arisen. Inventories are necessary in those cases where owing to the quantity of goods or commodities involved in the transaction it is not practicable to keep a separate account of each piece. An inventory is simply a lumping method of determining the gain or loss on the conversion of property in quantities where there is a fluctuation from year to year of the amount on hand, with a practical impossibility of separately itemizing the articles which are added or taken away."

It might correctly be said that the appellant is a fabricator, a constructor, and is not engaged in either the "production, purchase or sale of merchandise," except as incident to its work of construction, just as a builder of houses buys lumber and nails, and gets a lump sum for the finished product. But we prefer that the decision rest on broader grounds.

At the outset, it should be remembered that a wide discretion is vested in the Commissioner, and not in the courts; and, if the business is one where there is any substantial evidence indicating the necessity for the use of inventories, his decision, backed by majority opinion of the Board of Tax Appeals, should not be disturbed. On the other hand, if, under the agreed facts, a situation is presented where it is clear that the use of an inventory is not only not necessary, but, as a matter of fact, distorts rather than reflects income, then the appellant has a right to invoke the aid of the courts.

In approaching the problem it should be remembered that all of the acts of the Commissioner, all of the Treasury Regulations, all of the taxing statutes, draw their vitality from the Sixteenth Amendment to the Constitution, which gives to Congress the "power to lay and collect taxes on incomes." The Supreme Court said:

"Congress cannot by any definition it may adopt conclude the matter, since it cannot by legislation alter the Constitution, from which alone it derives its power to legislate, and within whose limitations alone that power can be lawfully exercised." Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570.

See, to the same effect, Taft v. Bowers, 49 S. Ct. 199, 73 L. Ed. ——, decided by the Supreme Court of the United States, February 18, 1929, and not yet reported.

The taxing statutes and the regulations prescribe rules and regulations as aids in arriving at true income, and are not designed to create income. In all tax matters, as in most others, the form must give way to the substance. Eisner v. Macomber, supra; Bowers v. Kerbaugh-Empire Co., 271 U. S. 170, 46 S. Ct. 449, 70 L. Ed. 886; Tucker v. Alexander, 25 F. (2d) 425 (8 C. C. A.). The provisions of the statute or regulations should not be extended, by implication, beyond the clear import of the language used. "Doubts are resolved against the government." Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211; U. S. v. Merriam, 263 U. S. 179, 44 S. Ct. 69, 68 L. Ed. 240, 29 A. L. R. 1574; Hellmich v. Hellman, 18 F. (2d) 239 (8 C. C. A.). And Judge Van Valkenburgh, now of this court, has said:

"This is, of course, the fundamental purpose of the law that the tax-payer should be taxed upon his actual income, and that this should neither be diminished nor increased by any arbitrary or artificial method of computation. As the laws say, 'the true income must be clearly reflected,' and for this purpose the regular and long-standing methods of accounting employed by the tax-payer, established in due course and for no ulterior purpose, are to be indulged.

"* * * But, if the books are kept, as the record shows they are, to show the exact state of the income upon completed contracts in each year, it is not perceived how greater difficulty can arise in the case of engineers than in that of building and construction work generally. Furthermore, the Government does not seek to secure a return upon income which is not accurate in fact and which casts an unjust burden upon the tax-payer." In re Harrington (D. C.) 1 F. (2d) 749.

Income has been authoritatively defined

as "the gain derived from capital, from labor, or from both combined," and in referring to that definition the Supreme Court has said:

"Brief as it is, it indicates the characteristic and distinguishing attribute of income essential for a correct solution of the present controversy. The government, although basing its argument upon the definition as quoted, placed chief emphasis upon the word 'gain,' which was extended to include a variety of meanings; while the significance of the next three words was either overlooked or misconceived. 'Derived—from—capital';— 'the gain—derived—from—capital,' etc. Here we have the essential matter: *not* a gain *accruing* to capital, not a *growth* or *increment* of value *in* the investment; but a gain, a profit, something of exchangeable value *proceeding from* the property, *severed from* the capital however invested or employed, and *coming in,* being '*derived,*' that is, *received or drawn by* the recipient (the taxpayer) for his separate use, benefit and disposal; *that* is income derived from property. Nothing else answers the description." (Italics by the court.) Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570.

The regulations cannot be broader than the statute. The statute authorizes the use of inventories, when, "in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any tax-payer. * * * *" While no case has apparently decided the question, it is undoubtedly true that the opinion of the Commissioner must be predicated upon facts reasonably justifying it; it may not be arbitrary. Foulke on The Federal Income Tax, § 642.

Is there any basis for determining that an inventory of this emergency steel is necessary in arriving at appellant's income, prior to the time when it is liquidated? It is stipulated that the appellant "carries no finished product in stock"; that is, unlike a retailer or wholesaler, or a miller, it is not a dealer. "It fabricates material for specific structures or contracts"; that is, it gets a contract first, and then does the work. Except for the supply in question, and the excess inventory on which taxes are paid, "material is ordered and procured from the mills for each specific structure or contract"; that is, it buys on the market and at the market for each job. Sometimes, when work is progressing, the material ordered is delayed in shipment or transit; rather than delay the job, then and then only—"for emergency use

(from which material is borrowed and replaced)"—the reserve steel in question is resorted to. When it is so used, "it is charged to the contract at its replacement cost and is promptly replaced with material of a like kind and in a like quantity"—presumably, as stated in argument, from the delayed car.

We have then this situation: The appellant is fabricating steel at Kansas City, some distance from steel mills; realizing the chance of delayed shipments, and in order to be able to compete in prompt execution of its contracts with other plants located near the mills, it carries a "stand-by" stock, replacing each girder used therefrom by the one ordered. There is in fact no profit at all realized from this emergency supply, other than the reputation of promptly doing the work. The profit of each job is exactly the same as if it had no such reserve. The profit is the same as if it borrowed the steel from a neighbor instead of from this pile. In fact, it might very well be that half this reserve steel would go into a bridge that showed a loss on the entire contract. The pile is the same on December 31, 1916, as it is on similar days in each succeeding year, except for the two years noted and not here involved. As long as it remains intact, there is no income from it, no matter what the market fluctuations are. When, if ever, it is liquidated, there will then be a profit or loss, but until then it is like its derricks and its cranes and its buildings; it is useful in the business, but, until liquidated, can show only paper profits which are neither realized nor taxable.

Upon argument, it was urged that, when the taxpayer took $1.70 steel out of the pile, and put it in a $4 contract, he made a profit; and whether he reinvested that profit in other steel that went into the pile is immaterial. This overlooks the stipulated facts. The taxpayer's contract was figured on $4 steel which he ordered from the factory; if a $1.70 girder was "borrowed" from the pile to-day, put into a bridge, and "replaced" to-morrow in "kind" with a $4 girder, there is no profit as long as he keeps the $4 girder for emergency use. In the briefs, it is argued that the appellant is like a merchant, who constantly replenishes his stock, always striving to keep a stock on hand to meet the demands of his trade. That but begs the question. In the first place, inventories are "necessary" for the multitudinous transactions of merchants, who buy first and sell afterward; they are not necessary for those who keep no finished stock, who sell no

goods, and who always contract first and buy afterward. Moreover, merchants keep no stand-by stock for years, promptly replacing in kind each item borrowed therefrom.

Taking the whole business of the taxpayer, as stipulated, and bearing in mind the admonition that the substance and not the form controls, we cannot escape the conclusion that, as a matter of fact, the existence or absence of this emergency supply does not add a dollar to the profit the taxpayer made on any contract he has ever executed; under the facts, it cannot affect his income, except as a good reputation helps him to other contracts, upon which he will pay a tax. When he abandons or cuts down the emergency pile, then he must account for his profit over the 1916 price of $1.70; but, like his cranes and derricks, until he does dispose of them, no taxable income accrues from the mere ownership. The facts in this case show that on December 31, 1916, this steel cost the taxpayer $1.70 per cwt. All during the years he kept it up and used it as an emergency reserve; in December, 1921, it took it into account for tax purposes—a theoretical liquidation. On that date, it was worth $1.50 per cwt., 20 cents less than it paid for it in 1916. Yet, by virtue of its ownership, the government has assessed a tax predicated on a profit of $18,000. True, income must be on an annual basis, and losses of this year may not offset profits of last. But here there was no actual profit in any year, and no actual profit when liquidated. An Iowa farmer who owned $150 an acre land in 1916, and who sold it in 1924 for $150 an acre, cannot be taxed because in 1918 or 1919 it had a market value of $300 an acre. This analogy, it is true, overlooks the specific individuality of two identical girders which may be interchanged one day with the next—"borrowed" and "replaced." But that is of the form rather than of the substance. The appellant derived no income during the years from the ownership of this emergency supply; it was a part of its equipment for doing business; its business was such that it was not necessary to include it in the inventory to arrive at actual income; to so consider it distorts, rather than reflects, the true income of the taxpayer.

This decision is necessarily confined to the facts of this particular business. If the appellant were a merchant or a manufacturer, where inventories were necessary to arrive at income, it must take into account all of its stock, and cannot set apart a "minimum" inventory. If the appellant, a build-er, used this emergency supply for tucking away profits actually made, it could not escape. If there was bad faith, or an excessive reserve, it would be otherwise. If it liquidated the pile and took its profit, it must pay. But these are not the stipulated facts. The stipulated facts show a builder, who keeps a supply of building materials against an emergency; it is reasonable in amount; it does not liquidate it on a high market and take its profit; it held it for years as a part of its fixed equipment; it never made a dollar out of it, except as it enabled it to secure other contracts on the profits of which it paid a tax; its existence produced no income, and there should be no tax.

The order appealed from in this case, and in No. 8359, stipulated to abide this case, are reversed.

WOODROUGH, District Judge (dissenting). The taxpayer being a contractor, of course its true income for any year was the difference between the receipts from its contracts and the cost to it of fulfillment; due allowances being made. Obviously the collector could not get at this amount from the book figures of the company because it charged the steel material for each job at the market, when, in fact, as stipulated, the same was supplied in part out of its own stock on hand which had cost it less than the market. Avoiding impasse, both parties naturally turned to inventory. There is no suggestion in the stipulation that the collector compelled recourse to inventory. The taxpayer and the assessor both use inventory. The dispute is about the kind of inventory valuations that the taxpayer sets up. On account of rising prices for steel in 1917, 1918, and 1919, valuation at the market of the steel inventory on hand at the end of each of those years figured out a considerable gain, which went into the assessment for income tax. After the fall of prices in 1920, the taxpayer benefited by corresponding reduction of its assessment and tax. It has undoubtedly paid tax on some gains which it did not liquidate into cash money, just as it got credit later on for a loss not actually paid out of pocket. But that is no ground to cancel the tax. That is what recourse to inventory for income tax assessment means. The taxpayer has not taken his gains in money. They are in his inventory, and the collector has to go there to find and assess them. I cannot see how this taxpayer stands in any different case than thousands of others whose inventory values rose and fell in the period. Many who were entitled

to it got relief under the inventory loss abatement provisions of sections 214 (a) (12) and 234 (a) (14) of the Revenue Act of 1918. The matter of such rebate for appellant was considered by the Board of Tax Appeals, and it was denied after hearing, and no appeal is prosecuted. Its valuation plan for its steel inventory wipes out all income from inventory gains, and avoids the tax altogether, and so avoids all tax much more effectually than the mere abatement for loss contemplated and provided for by Congress. But its plan, as I see it, is nothing more nor less that the old minimum inventory method which does not conform to the best accounting practice in trade or business. This for the obvious reason that it conceals the profits and loss of the business, and so defeats the object of keeping books. It arbitrarily picks out a time, December 31, 1916, when steel was at a certain price, and settles on the amount of steel that happened to be on hand at that time, and proposes to carry that amount at that same price through the ensuing years of price advance, and then, upon the fall of price and the return to normal, to resume inventory of all its steel at the market or cost if lower. Thus it eliminates consideration in particular years, and defeats any assessment therefor, and the tax goes with it. Of course, the company made some money by keeping an adequate stock of steel on hand and using it on a constantly rising market. But its plan of inventory valuation conceals the fact and excludes the government from any share. If it had held its steel in its piles during the period, there might be room for argument. But it did not.

The stipulation consists with the steel having been kept for about the same purpose and used in about the same way that stocks of raw material are ordinarily kept and used in many lines of business. The structural shapes and plates were produced in Pittsburgh and used at remote points. A stock had to be, and was, kept on hand. Not enough, of course, to fill all contracts, but enough "to insure prompt and orderly execution of contracts in view of delay, etc. incident to shipments from the mills and other exigencies affecting the availability for use when needed of material ordered for a particular job." There is no suggestion that the use was only when there was unusual or extraordinary delay of shipments, merely the "delay incident to shipment." Not a use confined to extraordinary "exigencies," merely the exigency that the job has to be done here and the mills are at Pittsburgh.

No stocks are carried on hand by merchants, manufacturers, or fabricants from choice. It is always done to insure orderly and prompt dispatch of business necessitated because the production or accumulation of goods or materials is at one point and the business at another. Such considerations suggest no test for the tax collector. His test is whether there is a continued commingling in an indistinguishable mass and a productive use out of the mass in the business. If there is, and the gains of the business are included in the increased value of the mass, he must compare the changing values of it every fiscal year, and that is what he has done in this case. The taxpayer had to carry a stock of steel and use it in its business. It fell as low as 1,500 tons in 1912, and rose as high as 11,000 tons in 1920, but fluctuated always in both quantity and value, and no cost price of any piece was ever to be distinguished in the mass. The collector rightly valued it at the market from year to year, assessed the increase, when there was any, with other gains and made deductions at the slump for losses. To upset this action seems to me to invite chaos in the collection of the revenues.

I am not unmindful of the words "emergency use" in the stipulation applied to appellant's use of the steel which it proposes to put in minimum inventory. I think the Commissioner acceded to the use of the words "emergency use" in the stipulation as reflecting appellant's mental processes about it. They refer to the contractor's preference to handle the steel direct from the mill to the place of fabrication and to the job without double handling at its yards when feasible; perhaps even direct from the mills to the job; the stipulation is not clear. It also refers to the preference that the stock be kept up to a desirable point as near as feasible. But the words cannot have any other reference or significance in the face of the plain admission in the stipulation that production was remote from the jobs to be done, and the material had to be carried in stock and used to insure orderly execution of contracts. I take it that the same preference to avoid double handling of heavy stuff and to keep stock up is general, and so all such stocks are for "emergency" use in that sense. I do not understand that the court concedes any more to counsel's arguments likening the use of steel from the pile to a borrowing from a neighbor than I do. Nor to the arguments about which structural piece came from the top or the bottom of the pile; nor to the matter of what pieces may have stayed in the pile all through the

history. These are simply attacks upon the recourse to any inventories by the tax collector. I understand it is not intended to strike down the acts and regulations concerning resort to inventory for income tax assessments, but the court discerns in the case of this taxpayer a peculiar situation amounting to an exception. It is to that conclusion, that there is anything peculiar about this stock carried or the uses made of it or the reasons for carrying it, that I cannot agree. It was necessary to carry it because the points of production, fabrication, and use were remote; it was replenished as are other stocks, not evenly, but with such intermittency that the mass fluctuated constantly; on a rising market, it gathered the gains of the business and on collapse its shrunken value reflected the loss. If this taxpayer can get its money back, so should thousands, because the use of inventories is practically universal. Nor can the government in the future count with any security upon the taxes it collects in times of rising prices. A span of years may even them up again, and, by this minimum inventory system of accounting, payments cheerfully made on gains well recognized at the time will be recovered by the shrewd and wary at the expense of the general.

The tax was laid and paid for the year 1918 when we had 10,000,000 men registered for war and millions in the field. The company ought not to get it back; nor for the year 1919 (dependent case No. 8359) either, when the men were coming back—mostly.